975 So.2d 1256 (2008)
William J. SUTTON, Appellant,
v.
FLORIDA PAROLE COMMISSION, State of Florida, Appellee.
No. 4D07-3653.
District Court of Appeal of Florida, Fourth District.
March 12, 2008.
Rehearing Denied April 1, 2008.
*1257 Carey Haughwout, Public Defender, Margaret Good-Earnest, Assistant Public Defender, West Palm Beach, for appellant.
Kim M. Fluharty, General Counsel, Florida Parole Commission, Tallahassee, for appellee.
FARMER, J.
We grant appellant's motion for rehearing and thus withdraw our previous opinion affirming the decision of the trial court without prejudice to pursue administrative remedies. The issue presented by this appeal turns out to be both novel to this court and significant. And a proper understanding of the case requires some context and history.
According to a popular TV series, the criminal justice system is divided into "two separate but equally important groups"  which it identifies as the police and the prosecutors. Actually that description applies only to the first half of the system, the one involved in establishing the guilt of an accused. After he is found guilty, there is yet another systemic division. This one deals with the imposition of punishment by a court, and then with the executive branch prison system administering the punishment imposed by the court so that the prisoner is released when his punitive debt has been fully satisfied.
The judge who imposes the punishment and the prison official who administers that punishment are governed by constitutional and statutory requirements. The judge may impose punishment no more severe than the law allows. In turn, prison officials must enforce the actual sentence imposed but may not administer that sentence in a way that would increase the punishment beyond what the court imposed. Prisoners are entitled to have the judicial system review the imposition and administration of their punishment in compliance with these laws. This case involves the administration of punishment and an issue of timely release when the sentence has expired.
Some history is necessary to illuminate the problem raised. Twenty years ago, Florida's sentencing laws allowed prisoners to accumulate substantial gain time against the sentence imposed by the court. When the time actually served plus their accumulated gain time equaled their sentence, they would be given an early release if there had been no prison misconduct.[1] The early release was unconditional and without any supervision. In 1988, however, the Legislature ended unconditional early release and imposed supervision and *1258 conditions in the Conditional Release Program Act (CRPA).[2] Under the new law, the prisoner's accrued gain time could still allow early release, but he would now remain under the supervision of the Florida Parole Commission, which could impose specified conditions on him.[3] If while on early release the prisoner violated one or more conditions, the Commission could return him to prison, take away the accrued gain time, and restore the balance of the sentence existing when he had been given early release.
Meanwhile, the Legislature began enacting new punishment laws, culminating in 1995 legislation significantly reducing the accumulation of gain time, as it had been employed until then. Henceforth, prisoners would be required to serve at least 85% of the actual sentence imposed no matter how much gain time they might accumulate.[4] Nevertheless substantial numbers of prisoners could still earn some form of early release.
Then for one class of prisoners, a new law curtailed actual release from prison at the expiration of a sentence. In 1998, the Legislature enacted the Jimmy Ryce Act (JRA) providing for the indefinite civil commitment of unreformable sex offenders after they had completed their prison sentence. For these prisoners, there would be no release from confinement, early or otherwise. When their sentence was fully served they would simply pass from criminal to civil confinement.
JRA requires the Department of Corrections to give the Commission early notice when a sexual offender is eligible for release from prison. Before a sexual offender is released, the Department must inform the State Attorney who may then file civil commitment proceedings under JRA. If a trial judge finds probable cause that the prisoner meets the requirements of JRA, he is transferred from confinement with the Department to confinement in another state facility pending a final determination under JRA.
Then if the jury in the JRA case finds the prisoner likely to commit new sex offenses, his civil commitment formally becomes indefinite. On the other hand, if the prisoner's sentence is fully expired and he is acquitted by the jury in the JRA case or the State dismisses it, he may have his liberty. But when, as here, the prisoner is given conditional early release under CRPA and a case is simultaneously brought under JRA but the JRA case ends in the prisoner's favor, there is some question as to whether or when he can have his liberty.
This last scenario involves the Commission's policy for early release of sex offenders under CRPA who are also brought under JRA. If the JRA case ends in favor of the prisoner, the Commission may charge him with violating the conditions of his release during his JRA commitment. If the Commission finds that he violated the CRPA conditions during the JRA proceedings, the Commission will revoke his conditional release, take away all the gain time, and re-impose the unserved balance of his sentence.[5]
*1259 The prisoner in this case is one of those given early release and simultaneously brought into proceedings under JRA. He had begun serving his 15-year sentence in July 1994. On account of accumulated gain time, by April 2000 he was entitled to early release under CRPA. Acting together, the two separate state authorities coordinated both an early conditional release under CRPA and also started JRA proceedings against him. The trial court found probable cause under JRA and committed him to civil confinement pending a final JRA determination. Instead of being released from confinement, he was thereupon simply transferred from his prison to a JRA facility operated by the State of Florida.
The record given us at this point does not contain a full account of events in the JRA case. It does show that on three occasions he was brought from the JRA confinement facility in Martin County into the circuit court in Palm Beach County for a hearing. There is no indication as to what happened in any of these hearings. It is nonetheless clear that, after confining him in a JRA facility for more than four years, in June 2004  again in coordinated proceedings  the State Attorney filed a voluntary dismissal of the JRA case while the Commission moved to revoke his conditional release. When the State dropped the JRA case it merely moved him back to his prison without counting against his sentence the four-year long JRA hold. In spite of being given "early release" as a result of the JRA proceedings he has been uninterruptedly imprisoned from the time sentence was imposed. Obviously the dismissal of the JRA case is a functional concession that the State has no legal basis to confine him beyond the 15-year sentence.
In moving to revoke his conditional release, the Commission charged him with refusing to participate in a sex offender treatment program while confined at the JRA facility and to submit to a drug test ordered by his supervising officer. He responded that his refusals were on advice of counsel, that his attorney told him that if he participated in a treatment program during the JRA confinement he would thereby waive any right to confidentiality in statements made to any person for such treatment. According to that advice, his statements would be used against him in the trial on the JRA claim to confine him indefinitely. In other words, he was given to understand that by participating in treatment and drug testing during the JRA case he would be furnishing the state with evidence to be used to confine him perhaps for the rest of his life.
The Commission's revocation charge was administratively tried before a Parole Examiner. She found that he violated conditional release by refusing sexual offender treatment and drug testing in the JRA case. At the same time, she also found that that his refusal was "clearly" based on legal advice by counsel, that his non-compliance was based upon his desire "to do the right thing" and not out of any desire "to break the rules." Accordingly, the Parole Examiner recommended that his conditional release be reinstated. Despite the recommendation, however, the Commission entered an order revoking release and denying any "award of credit for time on Conditional Release" in the JRA case. It does not appear that he ever sought judicial review of the Commission's revocation or the consequent refusal to credit the JRA confinement.[6]
*1260 After serving three more years of imprisonment since the FPC decision terminating early release, he has now filed the present motion under rule 3.800(a) to correct what he describes as an illegal sentence. His motion states that he seeks to have the period between 26 April 2000 and 3 June 2004 counted against the 15-year sentence (less 469 days of jail credit) imposed on 7 July 1994. He further states that if this period were properly counted against his sentence, he will be entitled to release from prison on 25 March 2008.[7]
On the other hand, he explicitly disclaims habeas corpus, explaining that he is not today asking for immediate release. Similarly, he disavows treating this appeal of the denial of relief under rule 3.800(a) as review of a denial of habeas corpus. He argues instead that rule 3.800(a) allows him "to move to correct an illegal sentence `at any time' and does not require him to wait under his sentence has expired before he asks for his appropriate credit [for] time served." The issues he raises are: (1) whether he is entitled to have the time spent in civil confinement under JRA counted against the 15-year sentence imposed in 1994; and (2) whether under rule 3.800(a) the court has jurisdiction to grant relief at this point. The second is antecedent, so we begin with it.
As we observed at the beginning, sentences are imposed by judges, and any sentence they impose must comply with the body of law. On the other hand, the sentences they impose must be administered by state agencies (the Department and the Commission), and these agencies must also follow the law in carrying out the sentence imposed. Executive branch officials have no legal authority to change or correct a sentence imposed by the judge. If there is an error in the sentence as imposed by the judge, it is the judge who must correct it under rule 3.800(a).
This is by way of explaining that rule 3.800(a) is designed for judges to correct an improperly imposed sentence. It is not intended to remedy later errors by the agencies charged with administering the sentence imposed. If the agency incorrectly administers a sentence legally imposed so that the prisoner spends more time in prison than the sentence provides, his remedy is within the agency first and, if not corrected by the agency, on judicial review by extraordinary writ.
In this case, the prisoner did not appear to have timely sought judicial review of the Commission's decision revoking his early release and denying him credit for the time under JRA. Instead, three years after the fact, he has belatedly filed this rule 3.800(a) motion to remedy the way the Department and the Commission are administering his legal sentence. His motion does not claim that the 15-year sentence imposed by the judge for his crime is invalid or needs correcting. He challenges only the manner in which the 15-year term is being counted or administered.
*1261 He cannot use rule 3.800(a) for this purpose. See Smith v. State, 682 So.2d 147 (Fla. 4th DCA 1996) (failure of the Department to credit unforfeited gain time does not make sentence allowing credit for prison time illegal; prisoner's remedy is not under rule 3.800 but by writ of mandamus); Dep't of Corrections v. Mattress, 686 So.2d 740 (Fla. 5th DCA 1997) (award of credit to sentence by the Department does not affect legality of sentence; judicial remedy is solely by mandamus); Robinson v. State, 818 So.2d 543 (Fla. 2d DCA 2002) (claim that the Department awarded less credit than provided in sentence cannot be brought under rule 3.800(a) but must instead be made by mandamus). Because he concedes that his sentence was legal when imposed, his remedy for the unlawful administration of his sentence is within the agency, whose decision may then be subject to judicial review by appropriate writ. When he failed to seek timely review of the Commission's revocation of early release by extraordinary writ, he gave up any remedy for the denial of early release until he is entitled to immediate release at the end of his sentence.
His circumstance should be compared with Martin v. Florida Parole Commission, 951 So.2d 84 (Fla. 1st DCA 2007). That prisoner's claim resembles this one, except for the question of immediate release. He too had been given early release, later revoked by the Commission. He challenged the revocation by habeas corpus, but the trial court held that his remedy was by certiorari because he was seeking review of the agency's decision. On appeal the district court reversed, finding habeas appropriate because he was seeking immediate release. The court also held that the one-year time limit on seeking review of such action was not applicable because there can be no statutory time bar to seeking immediate release under habeas corpus.
Here the prisoner disclaims immediate release, even though he does make plain that his true release date is imminent. His circumstance is thus like the prisoner's in Cooper v. Florida Parole Commission, 924 So.2d 966 (Fla. 4th DCA 2006), review pending, No. SC06-1236 (Fla. June 21, 2006). There the prisoner challenged the revocation of his early release by filing a petition for habeas corpus but did not claim entitlement to immediate release. We held that his remedy was to petition for mandamus to correct the agency's interpretation of the statute and that mandamus relief was covered by the one-year time limitation of section 95.11(5)(f), rather than rule 9.100(c)(2). We also made clear that habeas corpus was not available at that point because he did not seek immediate release. Plainly, the prisoner in this case is also seeking judicial review of the three-year old Commission decision to deny him credit against his sentence for the time he was confined under JRA. As in Cooper such a claim is covered by the one-year statute of limitations on prisoner petitions for extraordinary writs not challenging a conviction.
At this point, we could pass from this issue without addressing the whole purpose of his resort to court  that under the law he is entitled to count the JRA confinement against his prison sentence. But the parties have fully briefed that claim on the merits, and both seek a decision. Because the issue has obvious and important application for those who administer the system and those most affected by their decisions, we choose to address the issue and say what the law is.
In claiming credit for the JRA time, the prisoner stands on Tal-Mason v. State, 515 So.2d 738 (Fla.1987). There, a defendant was arrested, charged with murder, found incompetent to stand trial, and held *1262 for 5½ years in state mental institutions before becoming competent to face the charges. Being sentenced to prison upon his plea, he was thereupon denied credit for the time spent in the mental institutions. The Supreme Court held that it was error to deny him credit. The court explained:
"Tal-Mason clearly had no choice when he was confined in a state mental institution. He entered into no agreement with the state to obtain an early release from confinement or from any other punishment less restrictive than jail time. Rather than increasing his liberty, Tal-Mason's confinement was in the strictest sense a complete deprivation of liberty. He was in the total custody and control of the state at all times. And while his confinement involved psychological treatment, the primary purpose of both the treatment and the detention was to hold Tal-Mason until such time as he became competent to stand trial, if ever. Thus, his coercive commitment to a state institution was indistinguishable from pretrial detention in a `jail,' as that term is understood in common and legal usage."
515 So.2d at 739. The court agreed that "there is `no meaningful distinction . . . between incarceration before trial in a county jail, and state enforced confinement in a mental hospital in preparation for trial.'" 515 So.2d at 740. The court further noted that:
"[defendant] was not free on bail, had no control over his place of custody and was never free to leave the hospitals. For all practical intents and purposes, he was still in jail. The court takes judicial notice that the state mental hospitals have the facilities to enforce confinement of their patients, which brings them within the dictionary definition of a `jail.'"
Id. The court went on to hold that it could not agree that credit against a sentence was strictly limited to institutions formally designated as jail.
Sutton argues there is no meaningful factual distinction between Tal-Mason and the facts of his case. He had no choice when, under JRA, he was confined like a prisoner but in a state mental institution. He entered into no agreement with the State to obtain early release or from any other punishment less restrictive than jail time. Rather than increasing his liberty, his confinement was in the strictest sense a complete deprivation of liberty. He was in the total custody and control of the state at all times. His coercive commitment to a state institution cannot be distinguished from detention in a jail or a prison. He was not free on bail, had no control over his place of custody, and was never free to leave the facility in which he was detained under JRA. For all practical intents and purposes, he was still being held in prison under the JRA law.
In upholding the constitutional validity of JRA in State v. Goode, 830 So.2d 817 (Fla.2002), the court repeatedly emphasized that:
"the Legislature intended that ordinarily the review process of potential sexual predators would be concluded while the person was still in prison. The initial ex parte probable cause determination . . . applies primarily to respondents who are still in prison, and a finding of probable cause under this provision simply requires that a respondent be transferred immediately to a secure facility upon the expiration of the sentence."[8]
*1263 830 So.2d at 825. If the intent of JRA is that its essential fact be determined while the prisoner is still serving the sentence for the crime, it is obvious that the Legislature did not intend for JRA proceedings to extend or enlarge the criminal penalty. Nor, for that matter, do JRA proceedings subtract from the sentence. In short, JRA was conceived so that proceedings under its provisions would not affect the administration of any criminal sentence, and would be completed before the sentence was completely served, so as not to unconstitutionally extend the sentence imposed.[9]
The interplay between JRA and CRPA was the subject of David v. Meadows, 881 So.2d 653 (Fla. 1st DCA 2004). The issue there was whether the State could, as here, use CRPA to "release" a prisoner into a JRA proceeding. The court held that there was nothing in either Act barring the State from doing so. In so holding, however, the court made explicit that "[i]n the event that Meadows is found unable to comply with his release program because of his civil confinement, he should not be found in violation and should receive credit for the time during commitment." [e.s.] 881 So.2d at 655. David v. Meadows explicitly relied on Tal-Mason to reach that conclusion.
We agree with David v. Meadows. Sutton is entitled to have the JRA confinement counted against his 15-year sentence. On the other hand, early release under CRPA is no longer applicable because he did not seek timely review of the revocation and denial of JRA credit. Instead he now makes clear that with the JRA time counted against his sentence (along with the 469 days for jail credit awarded by the sentencing judge) on 25 March 2008 he will have actually served the entire 15-year term "day for day", as he puts it.
To be sure, his rule 3.800(a) motion really seeks an anticipatory ruling that the Department and Commission will not follow the law when his term finally expires on March 25th. We have now explained what the law is. As the Supreme Court once said in comparable circumstances: "There is no showing that [the state agency] will not follow the provisions of [the law] when petitioner becomes entitled to its benefits; the presumption is that officers will do their duty as the law directs them." Hall v. Mayo, 85 So.2d 592 (Fla. 1955). Any habeas corpus claim for immediate release thus being premature at this time, his appeal must be affirmed.
STEVENSON and DAMOORGIAN, JJ., concur.
NOTES
[1] Chet Kaufman, A Folly of Criminal Justice Policy-Making: The Rise and Demise of Early Release in Florida, and Its Ex Post Facto Implications, 26 FLA. ST. UNIV. L. REV. 361, 377 (1999). Owing to the former gain time laws, prisoners were serving little more than 40% of their actual sentences. Id. at 385.
[2] See Ch. 88-122, § 19, Laws of Fla.; § 947.1405, Fla. Stat. (2007).
[3] The length of conditional-release supervision is equal to the amount of gain time the inmate has accrued prior to release. See Evans v. Singletary, 737 So.2d 505, 507 (Fla.1999).
[4] § 944.275(4)(b)3, Fla. Stat. (2007).
[5] This procedure has been upheld in David v. Meadows, 881 So.2d 653 (Fla. 1st DCA 2004).
[6] We cannot but express our concern that this prisoner's counsel did not seek review of the Commission's decision. He was entitled to counsel during the JRA proceedings and to seek review of the decision to revoke his conditional release. See Shuman v. State, 358 So.2d 1333, 1335 (Fla.1978) (involuntary commitment to a mental hospital, like involuntary confinement of an individual for any reason, is a deprivation of liberty which the State cannot accomplish without due process of law). The failure to seek review appears prima facie ineffective assistance of counsel. We note that the able Assistant Public Defender now representing him was not involved in the revocation proceedings, which were conducted in the Twelfth Circuit, Desoto County.
[7] Fifteen years from 7 July 1994, minus the 469 days of pre-conviction jail credit (and without gain time of any kind), means that his sentence will have been fully served on 25 March 2008.
[8] In a footnote, the court pointedly observed:

"We would note that while the Legislature intended that the Ryce Act operate in this way, there is evidence that in practice this is not occurring and that often people are being detained for long periods after their scheduled release date without being taken to trial. The Florida Legislature's Office of Economic and Demographic Research has started releasing statistics which list the procedural distribution of people in the process of being committed under the Ryce Act. [c.o.] According to the statistics, the overwhelming majority of the people currently in the system are detainees awaiting trial after the expiration of their sentences. While the numbers do not indicate the cause of the delay, the number of persons being detained has consistently increased, which indicates that compliance with the thirty-day time limit for trial is rarely being practiced."
830 So.2d at 825. The extended time periods in this case demonstrate the continuing accuracy of the court's observation.
[9] Because Goode directly involved JRA, it is apposite authority as to whether Tal-Mason controls the entitlement to credit for confinement in JRA cases. Gay v. Singletary, 700 So.2d 1220 (Fla. 1997), did not involve JRA and is therefore inapt.